FRANK DIEHL FARMS, Diehl & Lee, MLC, Villemaire Farms, Inc., and V.V. Vogel & Sons Farms, Inc., Petitioners,

v.

SECRETARY OF LABOR and Occupational Safety and Health Review Commission, Respondents.

No. 81–7229.

United States Court of Appeals, Eleventh Circuit.

Feb. 3, 1983.

Rehearing and Rehearing En Banc Denied April 8, 1983.

Charles Kelso, Ann Margaret Pointer, Atlanta, Ga., for petitioners.

Edward G. Hoban, John A. Bryson, Attys., Dept. of Labor, Occupational Safety & Health Review Com'n, Andrea C. Casson, Anthony J. Steinmeyer, Marleigh D. Dover, Dept. of Justice, Washington, D.C., for respondents.

Before VANCE and JOHNSON, Circuit Judges, and ALLGOOD *, District Judge.

VANCE, Circuit Judge:

This petition to review an order of the Occupational Safety and Health Review Commission challenges the Commission's and the Secretary of Labor's new interpretation of the statutory workplace as it relates to housing, provided in this case to seasonal farm workers.

---

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. Frank Diehl Farms grows tomatoes on 125 acres and peppers on 25 to 30 acres. Diehl & Lee grows tomatoes on up to 125 to 140 acres and peppers on 30 to 40 acres. Villemaire Farms, Inc. grows tomatoes on approximately 100 acres. It also grows cucumbers and strawberries and has a lemon grove. V.V. Vogel & Sons Farms, Inc. raises tomatoes on up to 130 acres.

2. Frank Diehl Farms uses up to 120 temporary workers during the spring harvest. It provides free housing for up to 56 persons in a labor

The facts are not in dispute. Petitioners are four Hillsborough County, Florida farmers [1] each of whom employs seasonal workers and each of whom provides housing that is made available to the seasonal workers on a voluntary basis at little or no cost.[2] The workers are not required, either implicitly or explicitly, to live in the housing. Although petitioners presumably perceive the housing to be in their interest as an aid in maintaining a stable labor force, such housing is not essential to support such a labor pool. During the periods in question there has been a more than ample labor supply. The housing is not filled to capacity even during the peak of the harvest season. Some workers choose not to live in the housing provided. When work is available, the housed workers are required to work on the farm which provides the housing. At other times, however, they may continue to use the housing while working for other employers.

The issue raised on appeal is whether OSHA may regulate this housing. The evaluation of the OSHA regulations of housing provides the context for resolution of this issue. In 1971 acting under the authority of section 6(a) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 655(a) (the Act), the Secretary of Labor adopted Standard Z4.4–1968 of the American National Standards Institution (ANSI) as a consensus standard for temporary labor camps. 36 Fed.Reg. 10,466 (1971). The ANSI standard had a scope provision, but the scope provision was not incorporated into the standard as adopted by the Secretary. See 29 C.F.R. § 1910.142.

camp consisting of 13 mobile trailers. Diehl & Lee, MLC employs as many as 130 workers during harvest. It provides free housing in 12 trailers with a capacity of 54 persons. Villemaire Farms, Inc. utilizes as many as 70 temporary workers. It provides free housing for up to 60 persons in its labor camp. V.V. Vogel & Sons Farms, Inc. employs between 100 and 130 temporary workers during spring harvest. Between 70 and 85 of those workers generally reside in its camp consisting of a concrete block building, two army barracks and four houses for which each pays a fee of $10.00 per season.

Despite this initial silence on scope of jurisdiction, the Secretary in 1974 moved to clarify the issue. On September 23, 1974 the Secretary published a proposed new standard covering housing. 39 Fed.Reg. 34,057 (1974). The new standard contained many substantive revisions but stated that, insofar as the jurisdictional scope of the standard was concerned, its purpose was only "to more accurately describe the subject of the standard." *Id.* The proposed rule stated that the Act applies "to housing furnished by employers to employees, to the extent that such housing constitutes a *condition of employment*." *Id.* (emphasis added).[3] In 1976, after hearings the Secretary withdrew the proposed new standard stating that "[u]ntil such time as a single Departmental standard on employment related housing is promulgated, OSHA will continue to inspect temporary labor camps and enforce its *existing* standard, 29 C.F.R. § 1910.142." 41 Fed.Reg. 18,430 (1976) (emphasis added). Ten days after the proposed regulation was withdrawn, the Secretary issued Field Information Memorandum No. 76–17 entitled "Clarification of Procedures for Inspection of Migrant Housing Facilities." This memorandum instructed field inspectors to apply a condition of employment test.[4] Cases brought by the Secretary have been decided consistently with the condition of employment test. *See, e.g., Secretary of Labor v. Dryden Farms, Inc.,* [1977–1978] O.S.H.Dec. (CCH) ¶ 22,422 (1977); *Secretary of Labor v. Perres,* [1977–1978] O.S.H.Dec. (CCH) ¶ 21,783, *aff'd,* [1977–1978] O.S.H.Dec. (CCH) ¶ 22,117 (1977). *But see Secretary of Labor v. Mehlenbacher,* 6 O.S.H.Cas. (BNA) 1927 (1978) (applying but not articulating a directly related to employment test).

On June 15, 1979 OSHA issued Instruction CPL 2.37. This instruction replaced Field Memorandum No. 76–17. The new instruction rejected the "condition of employment" test in favor of a "directly related to employment" standard: housing was deemed covered by the Act so long as it was in fact directly related to employment.[5]

---

**3.** The proposed standard contained the following scope provisions:

(a) General—(1) Scope. (i) This section is applicable to all housing sites, including those that utilize tents, that are owned, managed or controlled by employers and are furnished by them to employees as a condition of employment; however, facilities which because of the nature of the work are mobile, such as may be the case with trailers and railroad cars, are not subject to the requirements in this section unless such normally mobile facilities are permanently located and not utilized as mobile facilities.

(ii) The furnishing of housing sites will be deemed a "condition of employment" only when the employees are required by the employer to utilize them, or are compelled by the practical or economic realities of the employment situation to utilize them. However, if housing made available by an employer is accepted by employees voluntarily, without contractual or practical compulsion, for example, on normal landlord-tenant bases, and in preference to other reasonably available facilities, such housing would not constitute a condition of employment.

39 Fed.Reg. 34,058–59 (1974).

**4.** The following facts shall be carefully documented:

. . . . .

(5) Determine if housing is provided as a condition of employment. Living in employer-provided housing is construed as a condition of employment if a) employers require employees to do so; or b) geographical circumstances require employees to do so, i.e., lack of comparable alternative housing in the area. Notwithstanding an appearance of a landlord-tenant relationship, OSHA standards are applicable when housing is provided as a condition of employment.

Field Information Memorandum No. 76–17 at § 2(c)(5).

**5.** OSHA Instruction CPL 2.37 provides in pertinent part:

A "temporary labor camp" or "migrant housing facility" is defined as farm housing directly related to the seasonal or temporary employment of migrant farm workers. In this context, "housing" includes both permanent and temporary structures located on or off the property of the employer, provided it meets the foregoing definition.

CPL 2.37 at § F(1).

Housing should be treated as employment-related if, a) employers require employees to live in the housing, or b) isolated location or lack of economically comparable alternative housing make it a practical necessity to do so, and/or c) the housing is provided or made available as a benefit to the employer.

*Id.* at § H(5). The Instruction then listed five factors to be considered in making this determination.

Following this new standard, the Occupational Health and Safety Commission (OSHRC) overturned the decision of an administrative law judge who had dismissed, for lack of jurisdiction, OSHA citations against migrant housing in a case factually similar to this one. *Secretary of Labor v. C.R. Burnett & Sons,* 9 O.S.H.Cas. (BNA) 1009 (1980).

■ The parties in this case agree that although the temporary workers' occupancy of the provided housing is not a "condition of employment," it is "directly related to employment." The administrative law judge determined that the latter was the correct test and accordingly held that the temporary housing was a "workplace" within the meaning of the Act, and subject to the requirements of 29 C.F.R. §§ 1910.142f and 1903(1), for the violation of which petitioners were cited. Because no member of the commission directed review, the administrative law judge's decision is a final order for purposes of our review.

The dispositive question presented is whether the Act may be construed to apply to this sort of housing which is work-related but which is not a condition of employment. Regulations under the Act clearly embrace more than the actual physical area where employees perform their labor. Petitioner concedes that OSHA has the statutory authority to enforce standards upon some temporary labor camps but argues that the authority extends only to those where residency is a condition of employment. The Secretary argues that it is not material whether laborers are compelled to live in the camp as long as the camp is "directly beneficial, convenient, or advantageous to the employer." *Secretary of Labor v. C.R. Burnett & Sons,* 9 O.S.H.Cas. (BNA) 1009, 1018 (1980) *citing Secretary of Labor v. Sugar Cane Growers Cooperative,* O.S.H. Cas. (BNA) 1320 (1976). Therefore, the Secretary argues, any housing provided by the employer for the purpose of guaranteeing a stable supply of labor is a "workplace" within the scope of the Act.

■ The Secretary urges us to defer to OSHRC's current interpretation of the scope of "workplace" in the Act. He argues that the 1976 field memorandum and proposed standard setting forth the condition of employment test were not compelled by the Act, but that these previous limitations were merely exercises of prosecutorial discretion. He urges that because condition of employment never was a requirement binding on the agency, adoption of a related to employment test cannot be seen as a change in requirements. We reject this position and find that adoption of the related to employment standard would constitute a departure from the Secretary's previous longstanding interpretation and enforcement practice. We also reject the Secretary's further argument that, even if we regard the agency's previous actions as an interpretation of the Act's permissible scope, the fact that the agency subsequently changed its view is no reason to withhold the normal degree of deference this court would otherwise give the agency's interpretation. *Andrus v. Sierra Club,* 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979). We conclude that as a matter of statutory construction, the agency was right the first time: the Act covers only housing that is a condition of employment.

(1)

The degree of deference due the agency's current interpretation.

■ We first note that an agency's interpretive rules are accorded less deference than its legislative rules. *Shell Oil Co. v. Federal Power Commission,* 491 F.2d 82, 88 (5th Cir.1974). Courts give great deference to agencys' statutory constructions that involve the agency's expertise and a lack of judicial expertise, *Oilfield Safety and Machine Specialties, Inc. v. Harman Unlimited, Inc.,* 625 F.2d 1248, 1257 (5th Cir.1980), or where the agency's construction is contemporaneous with the legislation and the agency participated in the legislative process. *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 556, 100 S.Ct. 790, 792, 63 L.Ed.2d 22 (1980); *Zuber v. Allen,* 396 U.S. 168, 192–93, 90 S.Ct. 314, 327–28, 24 L.Ed.2d 345

(1969). This deference is increased where the rule is made pursuant to an express delegation of legislative authority. *See Batterton v. Francis*, 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977). The weight given the interpretation by the reviewing court "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade . . . ." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

■■■ While we do not totally dismiss the Secretary's recent interpretation we find that it does not fare well when judged by the standards summarized above. The agency's current interpretation was not contemporaneous with the legislation. In fact it marks a significant departure from the agency's original practice. We agree with the Secretary that he is not absolutely bound by his previous interpretation, *see Modern Plastics Corp. v. McCulloch*, 400 F.2d 14, 19 (6th Cir.1968), but disagree with him concerning the amount of deference due the new formulation.[6] We are more reluctant to defer to an agency's more recent interpretation as authoritative when it conflicts with earlier pronouncements of the agency. *General Electric Co. v. Gilbert*, 429 U.S. 125, 143, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976). The Supreme Court's decision in *Andrus v. Sierra Club*, 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979) is consistent with this analysis. In *Sierra Club* the Court granted substantial deference to new regulations promulgated by the Counsel on Environmental Quality although they amounted to a "reversal of interpreta-

tion." *Id.* at 358, 99 S.Ct. at 2341. Conceding that its action was an exception to the general rule as articulated in cases such as *General Electric Co. v. Gilbert*, 429 U.S. 125, 143, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976), the Court emphasized that the reversal occurred during "the detailed and comprehensive process, ordered by the President, of transforming advisory guidelines into mandatory regulations . . . ." 442 U.S. at 358, 99 S.Ct. at 2341. In the present case, the Secretary has shown no such "detailed and comprehensive process" which would lead us to depart from the general rule articulated in *Gilbert.* In fact, the only such process evident was that surrounding the proposed standard containing the "condition of employment" test. We are therefore unwilling to give the agency's new interpretation the deference we would an agency's longstanding consistent pronouncement. *Skidmore*, 323 U.S. at 140, 65 S.Ct. at 164. Other factors mandating deference to an agency's action are similarly absent. This was an interpretive not a substantive ruling. It did not involve a technical matter, but rather involved a statutory construction well within the courts' expertise. *See Amchem Products, Inc. v. GAF Corp.*, 594 F.2d 470, 476 (5th Cir.), *modified on other grounds*, 602 F.2d 724 (5th Cir.1979); *Russell v. Law Enforcement Assistance Administration*, 637 F.2d 1255, 1264 (9th Cir.1980). The legislative history of the Act reflects no great participation of the agency in its drafting.

■■■ Although courts will normally give some deference to an agency construction, it "cannot be argued that such an [agency] interpretation is controlling." *Brennan v.*

---

**6.** The legal nature of the Secretary's scope interpretation is unclear. Neither the former nor the current interpretations were promulgated by notice and comment rulemaking. The Occupational Safety and Health Act authorizes the Secretary of Labor to prescribe necessary regulations. 29 U.S.C. § 657(g)(2). The Secretary does not argue that his interpretations of the scope of the Act, challenged here, are entitled to the deference due a rule made pursuant to his rulemaking authority under the Act. Such rules are legislative in nature and require notice and comment rulemaking under the APA. 5

U.S.C. § 553. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Since we decide that, as a matter of statutory interpretation, the Secretary is without jurisdiction to impose any requirements on temporary labor camps not meeting the condition of employment test, we do not decide whether the Secretary's current interpretation is an interpretative rule made subject to the procedural requirements of the APA. 5 U.S.C. § 553. *See* 2 K. Davis, Administrative Law Treatise §§ 7:17–20 (1979).

*General Telephone Co.,* 488 F.2d 157 (5th Cir.1973). *See also Chamber of Commerce v. OSHA,* 204 U.S.App.D.C. 192, 636 F.2d 464, 469 (1980). The agency construction "at best offers guidance to courts whose task it is to interpret statutes." *Brennan v. General Telephone Co.,* 488 F.2d at 160. The court remains the final authority on issues of statutory construction, *Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981), and cannot abdicate its ultimate responsibility to construe the language employed by Congress. *Zuber v. Allen,* 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969).

#### (2)

#### Statutory Construction.

 Examination of the words of the statute, its legislative history and its underlying policies leads us to reject the reasons advanced by the agency to justify its interpretation. *PPB Industries v. Harrison,* 660 F.2d 628 (5th Cir.1981). Our inquiry begins with the language of the statute. In the absence of clearly expressed contrary legislative intention, the plain language of the statute controls its construction. *Bread Political Action Committee v. Federal Election Commission,* 455 U.S. 577, 578, 102 S.Ct. 1235, 1237, 71 L.Ed.2d 432 (1982); *United States v. Martino,* 681 F.2d 952, 954 (former 5th Cir.1982) (en banc). Since Congress left the term "workplace" undefined in the Act, it should be given its ordinary, common sense meaning. *High Ol' Times, Inc. v. Busbee,* 673 F.2d 1225, 1229 (11th Cir.1982). The term "workplace" connotes the place where one must be in order to do his job.

Nothing in the legislative history of the Act indicates that Congress intended it to apply to places which are not places of work. The terms used repeatedly throughout the legislative history, "working conditions," "work situations," "occupational safety and health" hazards, "work-related injuries," "place of employment," "work environment," "business or workplace," "job-related injuries," indicate that Congress' central concern was avoidance of safety and health hazards at the place where work is performed. With the workplace as the central focus of the legislation, we must determine whether OSHA has authority to extend its jurisdiction beyond the place where work is performed to encompass a residence.

 The Secretary argues that the term "workplace" appearing in section 4(a) of the Act, 29 U.S.C. § 653(a), read in conjunction with other provisions of the Act which reveal the Act's purpose as assuring safe and healthful "work situations," section 2(a) of the Act, 29 U.S.C. § 651(a), "working conditions," section 2(b), 29 U.S.C. § 651(b), and "work experience," section 2(b)(7),[7] requires a broad reading of OSHA's grant of jurisdiction. But this argument, based on general policy considerations that lack self-limiting principles, proves too much. Migrant housing may well be unsafe and unhealthy, conditions that we deplore, but from that it does not follow that OSHA is the body authorized or even best suited to deal with these problems. OSHA does not possess a general mandate to solve the housing ills of America. It is true that the Act is remedial and should be construed liberally. *Whirlpool Corp. v. Marshall,* 445 U.S. 1, 13, 100 S.Ct. 883, 891, 63 L.Ed.2d 154 (1980). For example, the Secretary should be able to extend the Act's coverage to certain employer provided means of transportation and certain employer provided housing even though such extension exceeds the plain language of the statute. This

---

7. This expansion is not helpful except that it adds a term, "working conditions," which has a more precise definition in this circuit. Therefore, "working conditions" encompasses both a worker's "surroundings" and "hazards" incident to his work. *Southern Pac. Transp. Co. v. Usery,* 539 F.2d 386, 390 (5th Cir.1976), *cert. denied,* 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977). The fifth circuit also cited with approval the fourth circuit's definition of the term: "the environmental area in which an employee customarily goes about his daily tasks." *Id.* at 391 n. 10 *quoting Southern Ry. v. OSHRC,* 539 F.2d 335, 339 (4th Cir.), *cert. denied,* 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976).

does not mean that coverage may be extended to any employer provided device or facility. In order for coverage under the Act to be properly extended to a particular area, the conditions to be regulated must fairly be considered *working* conditions, the safety and health hazards to be remedied *occupational,* and the injuries to be avoided *work-related.* The safety of the place where the employee has to be in order to work was central to Congress' concern. We think that the condition of employment standard best reflects that concern.

### (3)

### Related Statutory Schemes.

We find nothing in the law of workmen's compensation which persuades us to adopt the broader construction advocated by the Secretary. We realize that the interplay between common law tort principles and workmen's compensation statutes and schedules cautions against wholesale adoption of that scheme in this context. However, state common and statutory law also apply to landlord-tenant arrangements between farmers and migrant workers. Thus we look to this body of law with interest.[8]

 Where an employee is injured in his living quarters which is on his employer's premises but he is not on call twenty-four hours a day he must show a stronger causal connection between the employment and the injury than an employee who is on twenty-four hour call. This stronger connection can be provided by the employer's requirement that the employee live there, as in *Carr v. United States Sugar Corp.,* 136 So.2d 638, 640 (Fla.1962).

When residence on the premises. is merely permitted, injuries resulting from such residence have generally not been held compensable under the broad doctrines built up around employees required to reside on the premises. This distinction has been applied when the source of injury was the burning of the bunkhouse, a fall from its porch, a fall down stairs, electrocution, and the burning of a tent furnished by the employer.

However, even in the absence of a requirement in the employment contract, residence should be deemed "required" whenever there is no reasonable alternative, in view of the distance of the work from residential facilities or the lack of availability of accommodations elsewhere. For example, in *Allen v. D.D. Skousen Construction Company,* the only alternative to living at the construction site was to walk 12 miles to the nearest town and 12 miles back. The employer therefore allowed claimant to pitch his tent on the site. While claimant was preparing his own breakfast, a can of gasoline near his tent became ignited in some unknown manner, and claimant was injured. Compensation was awarded. The principal point discussed was whether claimant must show that he was required to live on the premises. The court concluded that it was sufficient if, in view of the nature of the employment setting and the accommodations available, it was contemplated (as distinguished from required) that claimant should utilize the employer's bunkhouse or other on-premises sleeping facilities.

1 A. Larson, Workmen's Compensation § 24.40 (1982) (footnotes omitted). This analysis parallels our own. A formal re-

---

8. We also note the use of a standard analogous to that posed by the condition of employment test by the IRS in determining the exemptions for meals and lodging furnished by the employer. The meals and lodging furnished must be necessary to allow the employee "properly to perform his duties." *Commissioner v. Kowalski,* 434 U.S. 77, 93, 98 S.Ct. 315, 324, 54 L.Ed.2d 252 (1977). See *id.* at 95, 98 S.Ct. at 325 where the Court rejects the argument that any cash meal payments made for the conve-

nience of the employer but not necessary to allow respondent to perform his duties properly should qualify for the exclusion. *Cf. Oil, Chem. & Atomic Workers v. Mobil Oil Corp.,* 426 U.S. 407, 418–19, 96 S.Ct. 2140, 2145–46, 48 L.Ed.2d 736 (1976) (§§ 8(a)(3) and 14(b) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(3), 164(b), focus on post-hiring conditions the center of which is the place where work is performed).

quirement that the employee reside at the camp in order to be employed or a practical, economical, geographical or physical necessity which leads to the same result furnishes the necessary causal connection between the employment and the residence. When neither of these conditions exist the causation is too tenuous to allow coverage under the Act.

The Secretary argues that *Secretary of Labor v. Sugar Cane Growers Cooperative,* 4 O.S.H.Cas. (BNA) 1320 (1976), requires the application of the "directly related" test to temporary labor camps, since owner-provided transportation to and from the fields, covered by OSHA regulations in *Sugar Cane* would only be covered under the "directly related" test. In response we first note that the facts in *Sugar Cane* if not its analysis fall within the condition of employment test we adopt today. We also feel that the causal link between the activity and the employment is stronger in the case of transportation to and from the fields and between fields during the working day. This distinction is also recognized in workmen's compensation law. *See Van De Walle v. American Cyanamid,* 477 F.2d 20, 22–23 (5th Cir.), *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973). The reason for the difference between the court's treatment of employer provided transportation and housing is that transportation to and from the job site and the risks therein pertaining are more logically considered a true extension of the workplace and working conditions.

### (4)

#### Conclusion.

Only if company policy or practical necessity force workers to live in employer provided housing is the degree of coercion such that the hazards of apartment living are sufficiently related to employment to come under the scope of the Act. OSHA may then impose additional duties upon the employer as mandatory landlord to comply with its housing regulations, even though these places would not otherwise be "workplaces" and even though the hazards associated with the housing are different in kind

and quality from most occupational hazards. We find, therefore, that the condition of employment test previously used by OSHA is the essential bridge that links the residence to the workplace for the purpose of jurisdiction under the Act. Because OSHA assessed petitioners' farms for violations of 29 C.F.R. §§ 1903.2(a)(1), 1910.142, without jurisdiction, those assessments are

REVERSED.

JOHNSON, Circuit Judge, dissenting:

I respectfully dissent. The question in this appeal is whether the "directly related to employment" standard is within OSHA's statutory authority. I do not take issue with the majority that the agency's current interpretation is not entitled to the deference that would be its due if it had been the agency's position for a number of years. Nevertheless, the agency's current interpretation is consistent with the statute's language and policy and should therefore be upheld.

The majority states that the language and legislative history of the Act indicate that Congress intended that the Act apply only to "the place where one must be in order to do his job." It seems clear to me that the language of the statute is broader than that. Section 2(b) of the Act, 29 U.S.C. § 651(b), states that the purpose and policy of the Act is "to assure so far as possible every working man and woman in the Nation safe and healthful *working conditions ...* " (emphasis added). Section 2(a), 29 U.S.C. § 651(a), speaks of "work situations." Even the majority acknowledges that "[r]egulations under the Act clearly embrace more than the actual physical area where employees perform their labor" and that the Act covers "certain employer-provided means of transportation and certain employer-provided housing." Furthermore, the Supreme Court has declared that the Act is remedial and should "be liberally construed to effectuate the congressional purpose." *Whirlpool Corp. v. Marshall,* 445 U.S. 1, 13, 100 S.Ct. 883, 891, 63 L.Ed.2d 154 (1980).

The evidence reflects that petitioners' business of growing tomatoes and vegetables depends on a workforce that necessarily exceeds the number of workers who live in the local area. Therefore, the success of their operation depends on the availability of migrant workers. The transitory nature of migrant workers' housing is characteristic to the work they perform. The employers in this case have stated that they supply housing to workers at no or little cost in order to assure an available supply of labor. In return the workers who live in the camp are expected to work for the employer when requested to do so. The camps, therefore, are an intrinsic part of the "work situation" or "working conditions." That the farmers also employ workers who do not live in the camps does not alter the fact that they depend on the core of workers who reside in the camp.

Given the Act's broad purpose to assure safe working conditions, OSHA not only has the authority but has a duty to regulate conditions in labor camps when the "operation of the camp is directly related to the employment of its occupants." OSHA Instruction CPL 2.37. . Since the employers here have agreed that the provision of housing in this case meets the "directly related to employment" standard, I would deny the petitions for review and enforce the citations.