**FORGING INDUSTRY ASSOCIATION, Petitioner,**

v.

**SECRETARY OF LABOR, Respondent,**

**National Arborist Association, Inc., Intervenor.**

**No. 83–1420.**

United States Court of Appeals, Fourth Circuit.

Argued April 5, 1984.

Decided Nov. 7, 1984.

Sprouse, Circuit Judge, dissented and filed opinion.

Robert D. Moran, Washington, D.C. (Vorys, Sater, Seymour & Pease, Washington, D.C., on brief), for petitioner.

Steven R. Semler, Washington, D.C. (Zimmerman, Semler & Pritzker, Washington, D.C., on brief), for intervenor.

Judith N. Macaluso, Washington, D.C. (Francis X. Lilly, Deputy Sol. of Labor, Frank A. White, Associate Sol. for Occupational Safety and Health, Dennis K. Kade, Counsel for Appellate Litigation, Washington, D.C., Laura V. Fargas, Washington, D.C., on brief), for respondent.

Before SPROUSE and CHAPMAN, Circuit Judges and WARRINER, District Judge.*

CHAPMAN, Circuit Judge:

This case is before this court pursuant to Section 6(f) of the Occupational Safety and Health Act of 1970 ("Act"), 29 U.S.C. § 655(f).[1] The Forging Industry Association ("FIA") petitions this court to review

---

* Honorable D. Dortch Warriner, United States District Judge for the Eastern District of Virginia, sitting by designation.

1. Section 655(f) provides that:

Any person who may be adversely affected by a standard issued under this section may at any time prior to the sixtieth day after such standard is promulgated file a petition challenging the validity of such standard with the United States court of appeals for the circuit wherein such person resides or has his principal place of business, for a judicial review of such standard. . . . .

the Secretary of Labor's promulgation of a "hearing conservation amendment" ("amendment") to its occupational noise exposure standard, 29 C.F.R. § 1910.95 ("standard"). Finding that the Department of Labor's Occupational Safety and Health Administration (OSHA) exceeded its authority in adopting the amendment, we vacate the amendment and remand.

I

An occupational noise exposure standard has existed since OSHA's inception in 1971. The current standard, which is found at 29 C.F.R. § 1910.95, was originally promulgated under the Walsh-Healey Public Contracts Act, 41 U.S.C. § 35 et seq. for the purpose of protecting employees from workplace exposure to damaging levels of noise. The Walsh-Healey standard was adopted by OSHA pursuant to Section 6(a) of the Occupational Safety and Health Act, which allowed the Secretary to promulgate any established Federal standard within two years of the effective date of the Act without regard to established rulemaking procedure.

The standard establishes a permissible workplace limit of 90 decibels (db) [2] calculated using an 8-hour time-weighted average.[3] 29 C.F.R. § 1910.95(a). If the 90 db exposure limit is exceeded, the employer must reduce noise to or below this level by using feasible engineering or administrative controls.[4] *Id.* at § 1910.95(b)(1). If such controls are infeasible, employers may use hearing protectors, such as ear muffs or plugs, to reduce employee noise exposure to permissible limits. *Id.* Prior to amendment, the standard also contained a generally phrased requirement that employers administer "a continuing effective hearing conservation program" in workplaces where sound levels exceeded the permissible exposure level. *Id.* at § 1910.95(b)(3) (1980).

When studies revealed that many employees suffered significant hearing impairment at noise levels below the 90 db threshold, OSHA began the process of collecting and evaluating the information necessary to issue a comprehensive new regulation with a reduced permissible exposure level of 85 db. As an interim measure, OSHA adopted a hearing conservation amendment to replace the general conservation program requirement.

Despite its interim nature the requirements of the amendment are substantial. The amendment requires employers to determine which employees are exposed to or above an "action level" of 85 db measured as an 8-hour time-weighted average. 29 C.F.R. 1910.95(d). Such employees must be notified of the amount of sound they are exposed to and provided with an audiometric test to determine their hearing level. *Id.* at 1910.95(e), (g)(1). At least annually thereafter, the employer must provide the exposed employee with an additional test to determine whether the employee has suffered an average loss of hearing of 10 db, known as a standard threshold shift, or

**2.** Decibels are a measure of sound loudness. The entire spectrum of audible sound pressure can be compressed into a logarithmic scale of 0 to 140 db. Hertz ("Hz"), in contrast, measure the frequency of sound. Frequency is determined by the number of times that a complete cycle of compressions and expansions occurs in a second. The audible range of frequencies for people with good hearing is 20 Hz to 20,000 Hz.

**3.** The time-weighted average (TWA) combines noise level and duration of exposure to measure the accumulation of noise levels experienced by an employee over a workshift. OSHA computes the relationship between noise level and exposure time by using a 5 db "exchange rate." This

means that for each 5 db increase in noise level, the exposure time must be cut in half. For example, an employee who works for 4 hours in continuous noise of 95 db would be exposed to an 8 hour TWA of 90 db, as would an employee exposed to 100 db for 2 hours. 46 Fed.Reg. 4080/1; 29 C.F.R. § 1910.95, Table G–16.

**4.** Engineering controls involve modification of plant, equipment, processes, or materials to reduce noise; for example, adding a muffler to a vehicle. Administrative controls involve modification of work assignments to reduce employee exposure to noise; for example, rotating employees so that they work in noisy areas for a short time. 48 Fed.Reg. 7473/3.

"STS." [5] *Id.* at § 1910.95(g)(6). If there has been an STS, the employer must take follow-up measures to prevent the employee from reaching the material impairment stage. These measures include fitting the employee with hearing protectors, providing training, and requiring the employee to use the protectors. *Id.* at 1910.95(g)(8). The protectors must reduce the employee's exposure to an 8-hour TWA of 85 db or below. *Id.* at 1910.95(j)(3).

In addition, the employer must institute a training program on audiometric testing, hearing protectors, and effects of noise on hearing for all employees who are exposed to noise at or above an 8-hour TWA of 85 db. *Id.* at 1910.95(k). The employer must also retain records of employee exposure measurements and audiometric tests. *Id.* at 1910.95(m).

The provisions of the amendment apply to all employees covered by the Act, except those in construction, agriculture, and oil and gas well drilling and servicing. 46 Fed.Reg. 42622. OSHA estimates the annual cost of compliance for the amendment at $254,321,000.00. *Final Regulatory Analysis of the Hearing Conservation Amendment,* U.S. Department of Labor, Occupational Safety and Health Administration, Office of Regulatory Analysis (January 1981), part IV.

## II

An initial inquiry that must be made in determining the validity of any regulation adopted by a federal agency is whether the regulation is within the scope of the agency's statutory authority. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Examining the language of the Occupational Safety and Health Act and the Supreme Court decisions interpreting it, we find it clear that Congress only authorized the Secretary to adopt those standards which relate to health and safety *at the workplace.*

The Act in its statement of findings and declaration of purpose and policy refers repeatedly to "working conditions". 29 U.S.C. § 651(b). The Act defines the term "occupational safety and health standard" as "a standard which requires conditions ... reasonably necessary or appropriate to provide safe or healthful *employment* and *places of employment."* (emphasis added). 29 U.S.C. § 652(8).

In addition, the Supreme Court stated in the first OSHA case it considered that: "The Act created a new statutory duty *to avoid maintaining unsafe or unhealthy working conditions." Atlas Roofing Co. v. OSAHRC,* 430 U.S. 442, 445, 97 S.Ct. 1261, 1264, 51 L.Ed.2d 464 (1977) (emphasis added). In later cases, the Court further defined the scope of the Secretary's authority under the Act. "[B]efore he can promulgate *any* permanent health or safety standard [emphasis in the original], the Secretary is required to make a threshold finding that *a place of employment* is unsafe." *Industrial Union Department v. American Petroleum Institute,* 448 U.S. 607, 642, 100 S.Ct. 2844, 2864, 65 L.Ed.2d 1010 (emphasis added). Congress placed pre-eminent value on assuring employees "a safe and healthy *working environment." American Textile Mfrs. Institute v. Donovan,* 452 U.S. 490, 540, 101 S.Ct. 2478, 2506, 69 L.Ed.2d 185 (1981) (emphasis added).

Most importantly, given the vast number of factors outside of the workplace that can potentially affect an employee's health or safety (e.g. social and recreational activities, alcohol or drug use, defective consum-

---

**5.** Hearing loss is measured by an audiometer. Audiometers produce pure tones at specific frequencies (e.g., 250, 500, 1000, 2000, 3000, 4000, 6000, and 8000 Hz) and at specific sound levels. The record of a given individual's hearing sensitivity is called an audiogram. An audiogram shows hearing threshold level measured in decibels as a function of frequency in hertz. It indicates how intense or loud a sound at a given frequency must be before it can be perceived. Thus under the amendment, follow up measures are required whenever the quietest sound an employer can hear at 2000, 3000 and 4000 hz is an average 10 db louder than it was when the baseline audiometric test was performed.

er products), interpreting the Act to extend to hazards existing outside the workplace would place under OSHA's control areas already subject to regulation by other federal agencies (the Alcohol, Drug Abuse and Mental Health Administration, the Consumer Product Safety Commission, the Environmental Protection Agency, the Food and Drug Administration and the National Highway Traffic Safety Administration to name but a few).

In light of the foregoing, we follow the approach of the Eleventh Circuit which is that "the conditions to be regulated [by OSHA] must fairly be considered *working* conditions, the safety and health hazards to be remedied *occupational,* and the injuries to be avoided *work-related.*" *Frank Diehl Farms v. Secretary of Labor,* 696 F.2d 1325, 1332 (11th Cir.1983) (emphasis in the original) (OSH Act does not extend to hazards associated with housing provided to seasonal farm employees unless such housing is a condition of employment).

A standard is invalid if it requires an employer to take actions in regard to hazards existing outside the workplace. It is clear from the languge of the hearing con-

servation amendment, as well as the record before this court, that under the amendment employers may be subjected to requirements and penalties may be imposed as a result of non-workplace hazards. The amendment's requirements are triggered whenever an employee suffers a standard threshold shift loss in hearing. It is obvious that such a hearing loss can result from non-occupational noise exposure just as easily as it can from occupational exposure.[6] Airplanes, hunting rifles, loud music and a myriad of other sources produce noise potentially as damaging as any at the workplace. Yet the Amendment makes no distinction between hearing loss caused by workplace sources and loss caused by non-workplace sources. The rule-making record clearly provides that once a hearing loss is found, the amendment requires the *same* actions by the employer "whether or not the [loss] is work-related," 48 Fed.Reg. 9764/2, and that the subject rule contains no requirement that there be "a determination of work relatedness."[7] Id. at 9678/1.

Thus the hearing conservation amendment clearly imposes responsibilities on employers based on non-work-related hazards. Under the amendment, an employer whose workers are unaffected by work-

---

**6.** As the Department of Labor itself acknowledges:

There are few places you can go now to escape it. In any urban area, large or small, it's the roar of traffic, the thud of a pile driver, the staccato of a pneumatic drill, the shriek of a fire engine, the blast of a motorcycle, the blare of a rock and roll group, the whine of a jet overhead. Noise has become an inescapable component of modern, mechanized life. *Noise. The Environmental Problem. A Guide to OSHA Standards* U.S. Department of Labor, Occupational Safety and Health Administration (OSHA 2067) (reprinted from the July-August issue of Safety Standards magazine).

**7.** In a letter to this Court following oral argument, the Secretary refers to Section 8(g)(8)(ii) of the Amendment in support of his contention that the requirements of the hearing conservation amendment are *not* triggered by non-occupational noise. Section 8(g)(8)(ii) provides (emphasis added)

Unless a physician determines that the standard threshold shift is not work related or aggravated by occupational noise exposure,

the employer shall ensure that the following steps are taken when a standard threshold shift occurs. . . .

This clause is of little effect. An earlier draft of the amendment required that the professional reviewing employee audiograms determine whether any significant threshold shifts detected were caused by occupational noise exposure. In deleting this requirement in the final version, OSHA emphasizes:

Commenters stated that in some cases it is very difficult, even for an audiologist or otolaryngologist, to determine the cause, or work relatedness, of a significant threshold shift because of the similarity between an occupational and nonoccupational audiometric hearing loss configuration on the audiogram.

48 Fed.Reg. 9764/1 (citations to exhibits omitted). Thus it is apparent that OSHA itself places little confidence in a physician's ability to identify those workers whose hearing loss is not work related or aggravated by occupational noise exposure.

place noise may be subject to numerous requirements simply because its workers choose to hunt, listen to loud music or ride motorcycles during their non-working hours. Hearing loss caused by such activities is regrettable but it is not a problem that Congress delegated to OSHA to remedy. The amendment is therefore vacated and remanded to OSHA for the creation of a valid standard.

VACATED AND REMANDED.

SPROUSE, Circuit Judge, dissenting:

I respectfully dissent. Doubtless the majority is correct in asserting that the Occupational Safety and Health Act only authorizes regulation of unsafe conditions of the workplace, but I believe that the majority affords insufficient deference to the Secretary's conclusion that the hearing loss regulated by the Hearing Conservation Amendment is employment-related.

The Hearing Conservation Amendment proposes to regulate by detecting industrially-produced hearing loss and then arresting further deterioration by requiring the use of protective devices, employee training, and the posting of warning signs. The majority opinion obviated discussion of the details of the regulation by holding that the entire regulation exceeded OSHA's authority. I, therefore, confine this discussion to the majority decision. In my opinion there is more than substantial evidence to support the factual findings which form the basis of the Secretary's conclusion that the Hearing Conservation Amendment is "reasonably necessary or appropriate to provide safe or healthful employment," 29 U.S.C. § 652(8) (1982); *Industrial Union Dep't v. American Petroleum Institute*, 448 U.S. 607, 630–35, 642, 100 S.Ct. 2844, 2858–60, 2864, 65 L.Ed.2d 1010 (1980), and is therefore a valid exercise of his authority to promulgate occupational safety and health standards.

OSHA made factual determinations of the extent of the danger posed by work-

place noise before issuing this interim regulation. It found that there are 2.2 million workers in American production industries exposed to an eight-hour TWA between 85–90 db. Ten to fifteen percent of the workers exposed to an eight-hour TWA of 85 db will suffer material hearing impairment, as will twenty-one to twenty-nine percent of employees exposed to an eight-hour TWA of 90 db. These figures represent a composite of studies done by the Environmental Protection Agency, the National Institute for Occupational Safety and Health, the International Organization for Standardization, and Dr. W. Baughn of the General Motors Corporation. On the basis of these figures, OSHA identified the risk of hearing loss to these 2.2 million workers as a serious public health problem requiring regulation.

Besides determining from several objective sources the magnitude of the risk to workers, OSHA also considered two scientific studies of the projected benefits of the Hearing Conservation Amendment. Bolt, Beranek, and Newman, Inc., a consulting firm under contract to OSHA, concluded that over a twenty-year exposure period the amendment would save a maximum of 324,000 workers from occupationally-caused material hearing impairment. A closely related study by the Center for Policy Alternatives, under contract to the Environmental Protection Agency, concluded that if noise exposure were reduced from 90 db to 85 db, over a forty-year exposure period, 580,000 employees would be spared occupationally-caused material hearing impairment. OSHA carefully reviewed both studies and relied on them in preparing its own benefit analysis. After making what it considered to be appropriate adjustments for changes in size of the exposed work force, for the OSHA definition of material impairment, and for the protective ability of various devices, OSHA estimated that the total number of workers spared material impairment would be 212,000 in the tenth year, 477,000 in the twentieth year, 696,000 in the thirtieth year, 799,-

000 in the fortieth year, and 898,000 in the seventieth year.

Regulation of the industrial cause and effect of hearing loss obviously is not as simple as regulation of most mechanical hazards. Dangers inherent in the operation of moving machinery such as a table saw are easily perceived, and their causal relation to mutilated human limbs or eyes are readily understood and frustrated. Prevention of more subtle hazards requires more sophisticated solutions. OSHA resorted to scientific institutions to define the problem relating to industrially-caused hearing loss and relied on that information in designing its proposal. The court must apply the substantial evidence test deferentially, particularly when the Secretary's factual findings are based upon complex scientific and factual data or involve speculative projections. *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983); *United Steelworkers of America v. Marshall*, 647 F.2d 1189, 1206–07 (D.C.Cir.1980), *cert. denied sub nom. National Ass'n of Recycling Industries, Inc. v. Secretary of Labor*, 453 U.S. 913, 101 S.Ct. 3149, 69 L.Ed.2d 997 (1981). In these circumstances, the Agency's finding must only be within a "zone of reasonableness." *United Steelworkers*, 647 F.2d at 1207.

The Secretary's Hearing Conservation Amendment is clearly within the zone of reasonableness. In the first place, the amendment covers only those industries with a noise level that has been scientifically demonstrated to be a high risk factor to hearing health. Secondly, a threshold test is administered in those high risk industries, and hearing loss is measured after continued exposure to that high risk noise level.

To be sure, some hearing loss occurs as a part of the aging process and can vary according to non-occupational noises to which employees are exposed. The Hearing Conservation Amendment, however, is concerned with occupational noises—a hazard of the workplace. The hazard is identified as sustained noise of great intensity—85 db and above. Non-occupational noise of that intensity sustained over a period of eight hours each day is hard to imagine.

The amendment provides that non-occupationally caused hearing loss be excluded from its regulation. Assuming, however, that some loss caused by aging or smaller amounts of noise sustained for shorter periods also aggravates the hearing loss incurred by an individual employed in a high noise-producing industry, that is scant reason to characterize the primary risk factor as non-occupational. Breathing automobile exhaust and general air pollution, for example, is not healing to a wounded lung. That hardly justifies failure to regulate noxious workplace fumes that inflicted the primary wound. Nor would there be logic to characterizing regulation of the fumes as non-occupational because the condition inflicted is aggravated by outside irritants.

OSHA found that the amendment's cost to the regulated industries would average $41.00 annually per employee, and that it was economically feasible. Believing that the facts found by OSHA are supported by substantial evidence, and that the Secretary acted within his statutory authority and adequately explained the logic and policies underlying his regulation, *United Steelworkers*, 647 F.2d at 1207, I would affirm.