CHRIS BERG, INC.,
Plaintiff–Appellant,

v.

ACME MINING COMPANY, INC., Byron Development Corp., d/b/a Les Byron Associates, Gateway Investments Corp., Defendants–Appellees.

CHRIS BERG, INC.,
Plaintiff–Appellant,

v.

ACME MINING COMPANY, INC., Byron Development Corp., d/b/a Les Byron Associates and Gateway Investments Corp., Patricia E. Masters or Lester A. Byron, Defendants–Appellees.

CHRIS BERG, INC.,
Plaintiff–Appellant,

v.

ACME MINING COMPANY, INC., Byron Development Corp., d/b/a Les Byron Associates and Gateway Investments Corp., Patricia E. Masters or Lester A. Byron, Defendants–Appellees.

Nos. 89–5055, 89–5274, 89–5331.

United States Court of Appeals,
Eleventh Circuit.

Feb. 6, 1990.

C. David Tangora, Benson, Stalions, & Moyle, William H. Benson, Ft. Lauderdale, Fla., Arthur D. McCarry, Oles, Morrison & Rinker, Stuart G. Olos, Seattle, Wash., for plaintiff-appellant.

David R. Elder, Miami, Fla., for defendants-appellees.

Before VANCE* and COX, Circuit Judges, and CAMP**, District Judge.

PER CURIAM:

Plaintiff-appellant Chris Berg, Inc., appeals the involuntary dismissal pursuant to Fed.R.Civ.P. 41(b) of its claim against defendants-appellees Acme Mining Company, Inc., Byron Development Corporation (d/b/a Les Byron Associates) and Gateway Investments Corporation (hereinafter collectively "Acme"). Because the district court did not apply the existing law of fraud in Florida, we vacate the district court's order and remand for further proceedings.

I.

This case involves a dredging contract. In February of 1985, Norman Berg (herein-

---

* Judge Robert S. Vance concurred in this opinion prior to his death on December 16, 1989.

** Honorable Jack T. Camp, U.S. District Judge for the Northern District of Georgia, sitting by designation.

after "Berg" [1]), the owner of Chris Berg, Inc., a construction company in Seattle, contracted with Acme Mining to dredge a lake known as the Meekins Pit in Florida. Berg planned to use a light dredge known as the Super Dragon, designed for the removal of soil and small rock. Performance of the contract would require Berg to ship the dredge's components from Washington and Alaska and assemble it in Florida.

Before he signed the dredging contract, Berg conducted research to determine whether the site contained concentrations of rock that would exceed the Super Dragon's capabilities. First, Berg obtained engineering reports, from both Acme and his own engineers, describing the composition of the soil beneath the lake. These reports showed the presence of rock in thicknesses of six inches to a foot. After he had received these reports, Berg visited the Meekins site. Berg observed evidence of rock at Meekins Pit and learned that the site had once been used to mine aggregate.

Berg alleged in his complaint and testified at trial that, notwithstanding the aforementioned evidence of rock, Acme had defrauded Berg concerning the amount of rock at Meekins. Berg testified that during his visit to the site, Neil Study, an agent of Acme, told Berg that his dredge would encounter only sand. Study allegedly indicated a neighboring site consisting of sand as an example of what Berg could expect. Berg also testified that Acme's personnel assured him that he had been given all of the relevant soils information in their possession, but that such was not the case. In particular, one of the engineering reports Acme sent to Berg failed to include the engineering firm's worksheet, which showed the presence of rock in much larger quantities than Berg suspected. Berg further stated that he never received the so-called Canonie probe data, which also reported large concentrations of subsurface rock. Acme's purported motive for these claimed misrepresentations was to induce Berg to charge a lower rate for his dredging than the higher rate typically charged for the dredging of rock. Berg testified that he would not have entered into the contract if he had known the true nature of the Meekins soil.

After negotiation, the parties signed a contract. The contract stated that the dredging would consist of "sand or other sandy material." The agreement further stated, however, that Berg would be responsible for conducting an independent investigation of the site. The contract also contained an integration clause and a force majeure clause, but no changed site clause.

When Berg began performance of the contract, he uncovered large amounts of concentrated rock, beyond Super Dragon's normal capacity, requiring substantial additional expenditures on his part. Berg did not attempt to exercise the force majeure clause, but instead performed on the contract. He then sued for rescission and damages, alleging mutual mistake or unilateral mistake induced by fraud.

The case was tried before the district court without a jury. At the close of Berg's case, the trial judge granted Acme's motion for involuntary dismissal with prejudice pursuant to Fed.R.Civ.P. 41(b). In his order, under the heading "Conclusions of Law," the trial judge called both Berg's claim of unilateral mistake and his claim of fraud "untenable." Order at 5, *Chris Berg, Inc. v. Acme Mining Co.*, No. 87–6635 (S.D.Fla. Nov. 8, 1988). The court based this view on its conclusion that Berg had failed to show reasonable reliance, considering the engineering reports available to him and the contract's disclaimer clause which cautioned Berg to conduct his own investigation. *Id.* The court noted in its findings of fact that Berg's own expert witness had testified on cross-examination that, faced with the reports in Berg's possession, he would have been suspicious of the presence of rock. *Id.* at 4.

## II.

The main issue in this appeal is whether the district court correctly applied

---

1. Although this action was brought by Chris Berg, Inc., it is the actions of Norman Berg and his testimony at trial which concern us here.

We therefore use "Berg" to identify Mr. Berg and the full name of the enterprise to refer to Chris Berg, Inc.

**1238**

the law of fraud when it ruled on Acme's 41(b) motion.[2]

Formerly, some jurisdictions held that the recipient of a misrepresentation was not entitled to rely on it where reasonable investigation would have disclosed the truth. *See, e.g., Potakar v. Hurtak*, 82 So.2d 502, 503–04 (Fla.1955) (citing 23 Am. Jur. *Fraud and Deceit* § 155, at 960–62 (1940)). This rule proved too severe in its application, however: it penalized the victim for his lack of due care, but excused the defrauder. " '[N]o rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.' " *Southern States Ford v. Proctor*, 541 So.2d 1081, 1088 (Ala.1989) (Hornsby, C.J., concurring) (quoting *Chamberlin v. Fuller*, 59 Vt. 247, 256, 9 A. 832, 836 (1887)).

To avoid this inequitable result, most jurisdictions now permit the recipient of a fraudulent misrepresentation to rely on it whether or not a reasonable investigation would have uncovered the falsity of the representation. The prevailing rule, and the Florida law that governs this case, is that the recipient may rely on the misrepresentation unless its falsity is *subjectively known* or *obvious* to him. *Johnson v. Davis*, 480 So.2d 625, 628 (Fla.1985); *Besett v. Basnett*, 389 So.2d 995, 998 (Fla. 1980); Restatement (Second) of Torts §§ 540, 541 (1977); *cf.* E.A. Farnsworth, *Contracts* § 4.14 (1982). Therefore, whether Berg could reasonably have discovered the falsity of the alleged misrepresentation of Acme's agent is irrelevant. *Besett*, 389 So.2d at 998.

In order properly to have granted a motion under Rule 41(b), the district court must have found that the presence of rock greater than that contemplated by the contract was *known* or *obvious* to Berg. Instead, the court found only that Berg had not reasonably relied on Acme's state-

ments. The district court must be given the opportunity to apply controlling Florida law to the evidence it heard and make findings of fact that reflect that application. We therefore vacate the district court's order with instructions to reconsider the pleadings before it in light of this opinion.[3]

## III.

The order of the district court is VACATED and the cause is REMANDED to the district court for proceedings consistent with this opinion.

---

**2.** A Rule 41(b) motion is not a motion for a directed verdict, so the court must weigh the evidence and may consider the witnesses' credibility. *Emerson Electric Co. v. Farmer*, 427 F.2d 1082, 1086 & n. 9 (5th Cir.1970); *Gibbs v. King*, 779 F.2d 1040, 1046 (5th Cir.1986). Although we review *de novo* the district court's applica-

tion of law, we do not overturn the district court's findings of fact unless clearly erroneous. *Gibbs*, 779 F.2d at 1046.

**3.** It is unnecessary to reach appellant's remaining claims in light of our disposition of the fraud issue.