Jose Jesus CARO–GALVAN; Tomas Medina–Solorsano; Jose Muniz–Rodriguez; Francisco Caro–Martinez; Maria De Los Angeles Solano De Caro; Cathy Muniz; Juan Jose Solorsano; Pedro Briseno; and Irma Caro, Plaintiffs–Appellants,

Elmer Eden, Plaintiff,

v.

CURTIS RICHARDSON, INC., Defendant–Appellee,

Betty Fowler and Joe Fowler, Defendants.

No. 91–3543.

United States Court of Appeals, Eleventh Circuit.

June 25, 1993.

Gregory S. Schell, Florida Rural Legal Services, Inc., Lake Worth, FL, Ross B. Bricker, Jenner & Block, Moises Melendez, Steven F. Samilow, Miami, FL, for plaintiffs-appellants.

Elmer Eden, pro se.

F.A. Ford, Jr., Landis, Graham, French, Husfeld, Sherman & Ford, P.A., James R. Clayton, Clayton & Teal, PA, DeLand, FL, for Curtis Richardson, Inc.

Donovan Leisure, Rogovin, Huge & Schiller, Steven K. Hoffman, Annette M. Capretta, Washington, DC, amicus curiae, for Congressman George Miller.

Lois R. Zuckerman, Atty., U.S. Dept. of Labor, William J. Stone, Washington, DC, amicus curiae, for Secretary of Labor.

Carl M. Webster, Rural Law Center, Inc., Apopka, FL, amicus curiae, for Farmworker Ass'n of Cent. Florida (FACF).

## ON PETITION FOR REHEARING AND SUGGESTION OF REHEARING EN BANC

Before KRAVITCH, Circuit Judge, GODBOLD and OAKES *, Senior Circuit Judges.

KRAVITCH, Circuit Judge:

Appellee Curtis Richardson, Inc.'s petition for rehearing and suggestion of rehearing en banc are DENIED. No judge on active service has requested that the court be polled on rehearing en banc. Fed.R.App.P. 35; 11th Cir.R. 35–5. We have modified certain language from our previous opinion in this case, *Caro–Galvan v. Curtis Richardson, Inc.*, 981 F.2d 501 (11th Cir.1983). The earlier opinion is vacated and withdrawn, and the revised opinion below is substituted therefor.

* Honorable James L. Oakes, Senior U.S. Circuit Judge for the Second Circuit, sitting by designation.

1. Because the district court order which we review granted appellee's motion for involuntary dismissal at the close of plaintiffs-appellants' evidence, the facts found by the district court and recited in this opinion are based only on the evidence presented during appellants' case in chief.

2. Richardson grew and marketed asparagus as well as ferns. Technically, asparagus is different

At issue in this case are certain provisions of the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801–72 (1988) (AWPA), and the Fair Labor Standards Act, 29 U.S.C. §§ 201–19 (1988) (FLSA). The district court dismissed appellants' claims under those acts. We reverse and remand for further proceedings.

### I.[1]

Appellants are indigent farmworkers. Appellee Curtis Richardson, Inc. (Richardson) owns and operates fern farms.[2] Appellants worked for Richardson in Volusia County, Florida from 1983 to 1989, harvesting its fern crop and performing other field work.

Ferns are grown and harvested year-round. Most fern harvesting occurs from January through May, however, because weather conditions are more conducive to fern growth during those months and because the demand for ferns is greatest around the Valentine's Day, Easter, and Mother's Day holidays. This seasonal character of the fern industry was reflected in appellants' work. During the prime harvest season of January through May, appellants were able to cut enough ferns to earn more than minimum wage.[3] From June through December, appellants were unable to earn minimum wage cutting ferns. During this off-season period, Richardson offered appellants general field work at minimum wage, including weeding, pulling roots, cleaning, and performing other miscellaneous jobs. The off-season work was voluntary; Richardson allowed appellants to work elsewhere without risk of losing their jobs. Appellants rarely did so, however, because most employers in Volusia County similarly were affected by the cyclical demand for ferns and little alternative work was available.

from fern. Because asparagus constitutes only ten percent of Richardson's crop, however, Richardson's business generally is referred to as the fern industry. The district court and the parties have considered asparagus a fern for purposes of this litigation, and we do the same.

3. Richardson paid appellants 17 or 18 cents for each bunch of ferns they cut, gathered, and loaded onto trailers. Appellants typically earned $900 to $1000 dollars per month during this period.

While appellants were working for Richardson, they lived in trailers which Richardson owned. Richardson operated approximately twenty mobile homes at several sites around Volusia County. Appellants lived at one site where approximately eight trailers were located. All of the occupants at this trailer site were Richardson employees or their family members.[4]

Living conditions in the Richardson trailers were substandard. The trailers were unsanitary, structurally unsound, riddled with holes in the ceilings and floors, infested by rodents and insects, and generally in a state of disrepair. Weeks often passed before Richardson made necessary repairs.

Richardson charged rent of $150.00 a month per unit regardless of the number of occupants. Rent and utility costs were deducted from appellants' paychecks.[5] As a result of these deductions, appellants' take-home pay often fell below minimum wage. At times appellants' cash pay was zero. Richardson ordered appellants to vacate the trailers in May 1989 when it terminated their employment.

**II.**

In April 1989, shortly before they were fired, appellants brought this action seeking damages and injunctive relief under AWPA and FLSA.[6] The action was tried to the district court. After appellants rested their case, the court granted Richardson's motion for involuntary dismissal pursuant to Fed. R.Civ.P. 41(b).[7] The court concluded that appellants were not "migrant agricultural workers" entitled to the protections of AWPA. The court also found that Richardson had not fired appellants in retaliation for bringing this lawsuit, but because they failed to perform work they had agreed to do.[8] Finally, the court held that the amounts Richardson deducted from appellants' paychecks for rent and utilities were reasonable, and thus lawful under FLSA.

**III.**

Our task when reviewing a Rule 41(b) dismissal—and particularly our standard of review—is dictated by the unique characteristics of that rule. Although a Rule 41(b) dismissal is similar to a directed verdict in

4. Richardson rented units to nonemployees on at least two occasions for a rent of twice what it charged appellants. Those units were not at the location where appellants lived.

5. When two members of the same household both worked for Richardson, either only one member would have rent and utility charges deducted or the charges would be deducted on a prorated basis from each one.

6. In their second amended complaint, appellants alleged that Richardson violated AWPA by (1) failing to provide certain written disclosures at the time they began work; (2) failing conspicuously to post appellants' rights under AWPA; (3) providing incomplete wage statements; (4) failing to maintain certain records regarding their employment; (5) failing to provide adequate and safe housing; (6) failing to pay wages when due; and (7) discharging appellants in retaliation for exercising their rights under AWPA. *See* 29 U.S.C. §§ 1821–23, 1855. Appellants alleged that Richardson violated FLSA in that the deductions Richardson took from appellants' paychecks for rent and utilities unlawfully reduced their pay to below minimum wage. *See* 29 U.S.C. § 206.

    At first, a Mr. Elmer Eden also was a plaintiff in this case. Eden sued Richardson as well as two other defendants, Betty Fowler and Joe Fowler, for alleged violations of AWPA. The

district court dismissed Eden's claims before trial when Eden failed to appear.

7. At the time of the trial in January 1991, Rule 41(b) provided in pertinent part:

    After the plaintiff, in an action tried by the court without a jury, has completed the presentation of evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.

    This language was removed from Rule 41(b) in 1991, after the trial in this case. Its substance is found in the current version of Rule 52(c), which provides

    If during a trial without a jury a party has been fully heard with respect to an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party on any claim, counterclaim, cross-claim or third-party claim that cannot under the controlling law be maintained or defeated without a favorable ruling on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

8. Appellants have not appealed this finding.

favor of the defendant in a jury trial in that it involves an adjudication on the merits against the plaintiff at the close of the plaintiff's evidence, the standard for granting a Rule 41(b) motion to dismiss is significantly different from that for granting a defendant's motion for directed verdict. As our predecessor circuit explained in *Emerson Elec. Co. v. Farmer*, 427 F.2d 1082 (5th Cir.1970),[9] prior to 1948 several courts treated a 41(b) motion as a motion for a directed verdict. *Id.* at 1086. As such, the question was not whether plaintiff's evidence showed a right to recovery, but whether it constituted a prima facie case—that is, whether the evidence, taken in the light most favorable to the plaintiff, was sufficient for the case to go to the jury. *Id.* In 1948 the rule was amended to take account of the fact that "in a non-jury case the Court is supposed to act as Judge *and as jury.*" *Id.* (emphasis added). Thus, under the amended rule "the court must weigh the evidence and may consider the witnesses' credibility." *Chris Berg, Inc. v. Acme Mining Co.*, 893 F.2d 1235, 1238 n. 2 (11th Cir.1990).

In short, despite the fact that a Rule 41(b) dismissal occurs in the middle of trial, it is treated for standard of proof purposes as if it were a final adjudication at the end of trial. Accordingly, "[t]he usual standards applicable to review of a judgment on the merits in a nonjury case are controlling." 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 2376, at 248 (1971). "Although we review *de novo* the district court's application of law, we do not overturn the district court's findings of fact unless [they are] clearly erroneous." *Chris Berg*, 893 F.2d at 1238 n. 2.

■ If this court reverses an order of involuntary dismissal, the case proceeds as if the district court had denied the motion for dismissal in the first place. See Wright & Miller, § 2376, at 249.

Although the defendants must of course be allowed to present their evidence, the dis-

trict court need not compel [the plaintiff] to offer again the evidence it has already introduced. Nevertheless, plaintiff should be allowed to supplement the ... record, in chief or by rebuttal, with any evidence that could properly have been admitted at the first trial of [the] issues.

*Riegel Fiber Corp. v. Anderson Gin Co.*, 512 F.2d 784, 793 (5th Cir.1975); *accord White v. Rimrock Tidelands, Inc.*, 414 F.2d 1336, 1340 & n. 7 (5th Cir.1969). At the close of all the evidence, the district court should, as in all nonjury trials, make findings of fact based on all the evidence in the case, make conclusions of law, and apply the law to the facts as found. Of course, any legal principles announced by this court in reversing the order of dismissal are binding on the district court as controlling circuit law.

■ In this case, appellants do not contest the district court's findings of fact. Rather, two questions of statutory interpretation are presented: the meaning of the term "migrant agricultural workers" for purposes of AWPA, and which party bears the burden of proving that Richardson's charges for rent and utilities were reasonable (or unreasonable), and thus properly (or not properly) included in wages under FLSA. These issues raise questions of law which we review *de novo.*

### IV.

To qualify as a migrant agricultural worker under AWPA, an agricultural laborer must meet two requirements: he or she must be "employed in agricultural employment of a seasonal or other temporary nature," and must be "required to be absent overnight from his [or her] permanent place of residence." 29 U.S.C. § 1802(8)(A). We believe that, based on the evidence presented during appellants' case in chief, appellants satisfy both elements. They are the very type of farm laborers Congress intended AWPA to protect.[10]

---

9. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as precedent all decisions of the former Fifth Circuit rendered before October 1, 1981.

10. AWPA excludes from the definition of migrant agricultural worker "any immediate family member of an agricultural employer or a farm labor contractor" and "any temporary nonimmigrant alien who is authorized to work in agricultural employment in the United States" pursuant to

## A.

■ Our interpretation of AWPA is guided by several factors: the act's purpose as indicated in the legislative history; the plain meaning of the statute's language; the Department of Labor's interpretations; previous court interpretations; and other principles of statutory construction. *See Soliz v. Plunkett*, 615 F.2d 272, 275 (5th Cir.1980) (construing predecessor to AWPA); *see also Bresgal v. Brock*, 843 F.2d 1163, 1166 (9th Cir.1987) (construing AWPA). Our ultimate goal is to give effect to congressional intent. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989); *Brock*, 843 F.2d at 1166. AWPA is a remedial statute and should be construed broadly to effect its humanitarian purpose. *Bracamontes v. Weyerhaeuser Co.*, 840 F.2d 271, 276 (5th Cir.), *cert. denied*, 488 U.S. 854, 109 S.Ct. 141, 102 L.Ed.2d 113 (1988); *see Soliz*, 615 F.2d at 275 ("[B]road construction of the Act 'comports with the Act's humanitarian purpose to protect all those hired by middlemen to toil in our nation's fields, vineyards and orchards.'") (quoting *Usery v. Coastal Growers, Inc.*, 418 F.Supp. 99, 101 (C.D.Cal.1976), *aff'd sub nom. Marshall v. Coastal Growers, Inc.*, 598 F.2d 521 (9th Cir.1979)).

## B.

Legislative history, administrative interpretation, and judicial precedent all lead us to conclude that the evidence which appellants introduced at trial was sufficient to show that they were engaged in agricultural work "of a seasonal or other temporary nature." This is true notwithstanding that

ferns are harvested throughout the year and appellants could have worked for Richardson, and often did work, year-round.

## 1.

AWPA divides the employees it covers into two, mutually exclusive categories: migrant agricultural workers, *see* 29 U.S.C. § 1802(8), and seasonal agricultural workers, *see id.* § 1802(10). Both classifications require that the farmworker be engaged in agricultural employment of a seasonal or other temporary nature. Hence, seasonal or other temporary employment encompasses all farmworkers whom Congress intended AWPA to cover.

To determine to whom Congress intended the act to apply, we look to AWPA's predecessor, the Farm Labor Contractor Registration Act of 1963, Pub.L. No. 88–582, 78 Stat. 920 (FLCRA) (codified as amended [11] at 7 U.S.C. § 2041 et seq.) (repealed 1983).[12] FLCRA was the first major federal effort to improve the lot of agricultural laborers who "have long been among the most exploited groups in the American labor force." S.Rep. No. 93–1295, 93d Cong., 2d Sess. 1–3 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6441, 6441–43. Farm laborers suffer from chronic "low wages, long hours and poor working conditions." H.R.Rep. No. 97–885, 97th Cong., 2d Sess. 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 4547, 4547.[13] Congress recognized that "[b]ecause of [a] virtually insurmountable wall of economic, social, educational, language, and cultural barriers facing [most agricultural workers] their reliance upon [the farm labor] contractor is extraordinarily heavy, and in many cases, total." W.

---

the immigration laws. *29 U.S.C. § 1802(8)(B).* Neither of these exceptions applies to appellants.

**11.** In 1974, Congress extended FLCRA's coverage and created a private right of action for workers aggrieved by violations of the act. *See* Farm Labor Contractor Registration Act Amendments of 1974, Pub.L. 93–518, 88 Stat. 1652 (repealed 1983); S.Rep. No. 93–1295, 93d Cong., 2d Sess. 1, 5–6 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6441, 6445–46.

**12.** The chief target of FLCRA was the crew leader, a typically unscrupulous recruiter and transporter of indigent farm workers. S.Rep. 93–1295 at 3, 1974 U.S.C.C.A.N. at 6443. FLCRA required crew leaders to register with the De-

partment of Labor and to furnish their workers with certain job-related information. *Id.*

**13.** The families, and particularly the children of these workers have also suffered from the typical symptoms of chronic poverty—being undereducated, ill-fed, poorly housed, and lacking even the most rudimentary health and sanitary facilities. The tragedy is further compounded when it is realized that the victims of this poverty are in fact the working poor, those who offer an honest day's labor, but are denied the full benefits such work should provide, which are so desperately needed to provide the most basic necessities of life. S.Rep. No. 93–1295 at 1–2, 1974 U.S.C.C.A.N. at 6441–42.

Gary Vause, *The Farm Labor Contractor Registration Act,* 11 Stetson L.Rev. 185, 198 (1982). Hence, they are at the mercy of their employers as to the conditions and terms of their employment. *See De la Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 229 (7th Cir.1983) (stating that FLCRA was enacted "as a response to the problems of exploitation of migrant agricultural workers"). *See generally* Vause, 11 Stetson L.Rev. at 186–98 (discussing characteristics and problems of the migrant farm labor force).

Congress substituted AWPA for FLCRA in 1982 because FLCRA had failed measurably to aid exploited farmworkers yet was hampering agricultural employers with its onerous registration requirements. H.R.Rep. 97–885 at 3, 1982 U.S.C.C.A.N. at 4549; 128 Cong.Rec. S11739 (daily ed. Sept. 17, 1982) (statement of Sen. Hatch). To ease the burden on agricultural employers, AWPA eliminated many of those requirements.[14] Significantly, however, to achieve the equally important objective of rendering more effective federal protections of exploited farmworkers, AWPA "maintains the basic farmworker protections under ... FLCRA." 128 Cong.Rec. S11739 (statement of Sen. Hatch). Throughout the legislative history, agricultural employers, members of Congress, and executive branch officials alike make clear that AWPA was not intended to narrow the class of workers entitled to protection against exploitation. *See, e.g., Hearing on the Migrant and Seasonal Agricultural Worker Protection Act: Hearing on H.R. 7102 Before the Subcomm. on Labor Standards of the House Comm. on Education and Labor,* 97th Cong., 2d Sess. 45 (1982) [hereinafter *1982 House Hearing* ] (statement of Robert B. Collyer, Deputy Under Secretary of Labor) ("Our guiding principle ... was to de-

velop consensus legislation which would provide essential protections for farm workers within a rational statutory structure...."); *id.* at 57 (statement of Perry R. Ellsworth, Executive Vice President, National Council of Agricultural Employers) (AWPA "continues and, in some areas, strengthens farmworker protections"); 128 Cong.Rec. S11839 (statement of Sen. Quayle) (AWPA "would continue to provide and even expand protections for migrant and local seasonal farm workers"). Thus, the protective reach of AWPA, and accordingly the meaning of the term "seasonal or other temporary" employment, extends to all workers who were within the purview of FLCRA.

FLCRA had a single category of protected employees: "migrant workers." 7 U.S.C. § 2042(g) (repealed 1983). The sole requirement for coverage as a migrant worker under FLCRA was that the worker be engaged in agricultural labor.[15] Agricultural labor included the harvesting of agricultural or horticultural commodities. *See* 29 U.S.C. § 203(f); 26 U.S.C. § 3121(g). The act was not limited to workers who literally were itinerant; it also applied to some persons working year-round for the same agricultural employer. Opinion Letter No. 1555 (WH–501) [Wage–Hour] Lab.L.Rep. (CCH) Admin. Rulings Tr. Binder 1979–81, ¶ 31,341, at 43,-437 (December 4, 1979). Courts uniformly recognized that migrant worker was "a term of art, having no reference to workers with migratory tendencies." *Marshall v. Coastal Growers Ass'n,* 598 F.2d 521, 524 (9th Cir. 1979); *accord Donovan v. Marrero,* 695 F.2d 791, 794 (3d Cir.1982); *Rodriguez v. Bennett,* 540 F.Supp. 648, 649–50 (D.P.R.1982); *see also Almendarez v. Barrett–Fisher Co.,* 762 F.2d 1275, 1283 (5th Cir.1985) (referring to workers as *"statutory* 'migrant workers' ")

---

14. For example, AWPA distinguishes between the traditional farm labor contractor—the crew leader—and the fixed-situs employer, requiring the former to register with the Department of Labor but not the latter. Registration was unnecessarily burdensome for fixed-situs employers who, unlike crew leaders, do not move from state to state. 128 Cong.Rec. S11838–39 (daily ed. Sept. 20, 1982) (statement of Sen. Quayle); *see* 29 U.S.C. § 1802 (defining "agricultural association," "agricultural employer," and "farm labor contractor"). For a detailed description of the changes Congress wrought with AWPA, see Don-

ald B. Pedersen, *The Migrant and Seasonal Agricultural Worker Protection Act: A Preliminary Analysis,* 37 Ark.L.Rev. 253 (1983).

15. The act defined a migrant worker as "an individual whose primary employment is in agriculture, as defined in section 203(f) of title 29 [the FLSA], or who performs agricultural labor, as defined in section 3121(g) of title 26 [the Internal Revenue Code], on a seasonal or other temporary basis." 7 U.S.C. § 2042(g) (repealed 1983).

(emphasis added); Vause, 11 Stetson L.Rev. at 190 ("[T]he 'seasonality' of the work is apparently irrelevant under the Act.").

■■■■ The evidence in this case was that appellants harvested, weeded, pulled roots, and performed other agricultural jobs, and thus performed traditional agricultural labor. As such, they would have been entitled to the protections of FLCRA. *See Marshall v. Hunter,* 97 Lab.Cas. (CCH) ¶ 34,376, at 45,-413–16 (M.D.Fla.1983) (finding that employer violated FLCRA as to employees who weeded fern in Volusia County, Florida).[16] Accordingly, appellants were employed in agricultural employment of a seasonal or other temporary nature for purposes of AWPA. 29 U.S.C. § 1802(8)(A).

Admittedly, in defining "migrant worker" in FLCRA, Congress distinguished an individual for whom agriculture was "primary employment" from one who worked in agriculture "on a seasonal or other temporary basis," covering them both. 7 U.S.C. § 2042(g) (repealed 1983). By contrast, AWPA covers only employment of a seasonal or other temporary nature. 29 U.S.C. §§ 1802(8)(A), 1802(10)(A). Hence, it is arguable that AWPA's scope is narrower than its predecessor's. We believe, however, that the legislative history clearly evinces Congress' intent not to narrow the class of protected workers, notwithstanding the somewhat different language of the two acts. Because farm laborers are poor, politically weak, and excluded from the overtime and collective bargaining rights afforded other types of workers,[17] they *always* are vulnerable to exploitation, not just when they migrate from job to job. Construing AWPA broadly to effect its humanitarian purpose, we find that, like "migrant worker" under FLCRA, Congress intended "employment of a seasonal or other temporary nature" to be a term of art not limited to short-term or itinerant workers.

2.

Our conclusion from the legislative history that seasonal or temporary employment includes employees like appellants is further supported by the Labor Department's regulations and its administrative rulings expounding on those regulations. This court, as required by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), accords significant weight to the statutory interpretation of the executive agency charged with implementing the statute being construed, particularly when that interpretation is incorporated in a formally published regulation. *Id.* at 844, 104 S.Ct. at 2782; *see, e.g., Continental Can Co. v. Mellon,* 825 F.2d 308, 311 (11th Cir.1987) (per curiam); *Soliz,* 615 F.2d at 276.

The Labor Department's AWPA regulations provide that

[l]abor is performed on a seasonal basis where, *ordinarily,* the employment pertains to or is of the kind exclusively performed at certain seasons or periods of the year and which, from its nature, may not be continuous or carried on throughout the year. *A worker who moves from one seasonal activity to another, while employed in agriculture or performing agricultural labor, is employed on a seasonal basis even though he may continue to be employed during a major portion of the year.*

29 C.F.R. § 500.20(s)(1) (emphasis added). Seasonal or temporary work

does *not* include the employment of any worker who is living at his permanent place of residence, when that worker is employed by a specific agricultural employer or agricultural association on essentially a year round basis to perform a

---

**16.** Indeed, Richardson conceded in the district court that appellants would have been covered by FLCRA. In support of its motion for involuntary dismissal Richardson attempted to distinguish AWPA from FLCRA as follows:

Prior to 1983 the predecessor [to AWPA] was what they called the Farm Labor Contractor Registration Act of 1963. Now, *the Farm Labor Contractor Registration Act would have, in*

*fact, given [appellants] jurisdiction and would be properly before the court,* but in 1983 migrant worker was substantially different. (emphasis added).

**17.** *See* 29 U.S.C. § 152(3) (excluding agricultural laborers from definition of employee under National Labor Relations Act); *id.* § 213(b)(13) (FLSA).

variety of tasks for his employer *and is not primarily employed to do field work. Id.* § 500.20(s)(4) (emphasis added).

These regulations recognize that year-round employment may qualify as seasonal within the meaning of AWPA. As the Secretary of Labor points out in her brief amicus curiae, the fact that covered employment *ordinarily* will not be performed year-round does not mean that seasonal work can *only* be performed at certain times of the year. The regulations make clear that "it is the nature of the work rather than the duration of employment which controls." Opinion Letter No. 1575 (WH–522) [Wage–Hour] Lab.L.Rep. (CCH) Admin. Rulings Tr. Binder 1981–87, ¶ 31,440, at 43,760 (April 23, 1984). If the worker performs "field work," he or she is employed on a seasonal or temporary basis. *See* 29 C.F.R. § 500.-20(s)(4).

Official Labor Department interpretations of the regulations bolster this conclusion, holding explicitly that the touchstone for seasonality is whether the employee is involved in field work.[18] Opinion Letter No. 1575, at 43,760; Migrant and Seasonal Agricultural Worker Protection Regulations, 48 Fed.Reg. 36,737 (1983) (responding to comments on interim regulations). For example, the Labor Department's Wage–Hour Administrator concluded that AWPA would apply to a person "employed and paid year-round for more than 300 days a year by a single employer," if the employee performed field work. Opinion Letter No. 1575, at 43,760. This construction is consistent with the legislative history which shows that seasonal or temporary employment under AWPA includes all employment previously covered by FLCRA—that is, all agricultural labor. *See, e.g.,* H.R.Rep. 97–885 at 11, 1982 U.S.C.C.A.N. at 4557 (recognizing distinction between research activities, which are exempt from coverage under AWPA, and "traditional field work").

In *In re Ruggieri Mushroom Farms v. Secretary of Labor,* No. 85–MSP–35, Lab. L.Rep. (CCH) ¶ 31,480, at 43,857 (May 13, 1987), a case very similar to this one, a Labor Department administrative law judge found employees to be migrant workers under AWPA despite the fact that they could have worked for their employer year-round. The employer in *Ruggieri* had argued that its workers were not migrants because the employer's product, mushrooms, are grown year-round; employees could choose to work fifty-two weeks a year; and fluctuations in employment resulted not from layoffs but from the employees' decisions to seek better working conditions and wages. *Id.* at 43,859. The judge rejected these arguments for several reasons. The judge noted that "[a]lthough the mushrooms are grown year round ..., summer appeared to be a slack season ... [during which] workers were given other work to do ... such as cleaning and mowing." *Id.* at 43,860. Thus, the work had a distinct seasonal quality. Furthermore, the employer's average employee turnover rate was nearly seventy-five percent, suggesting that the work was of a temporary nature. *Id.* After reviewing the legislative and regulatory background, the judge concluded that the mushroom workers "are the kind Congress intended to protect." *Id.*

Like the employer in *Ruggieri,* Richardson argues here that appellants were not seasonal or temporary workers because ferns are harvested year-round and because appellants could have worked, and sometimes did work, for Richardson fifty-two weeks a year. But, like the workers in *Ruggieri,* appellants "move[d] from one seasonal activity to another, while employed in agriculture or performing agricultural labor." 29 C.F.R. § 500.-20(s)(1). From January through May, they harvested ferns. During the rest of the year—the distinct "slack season" in which fern harvesting was so slow appellants could not even earn minimum wage doing it and thus were free to work elsewhere—they weeded, cleaned, did some harvesting, and worked other miscellaneous jobs. Furthermore, the work that appellants performed was field work. According to AWPA's legislative and regulatory history, such work constitutes seasonal or temporary agricultural employment. Consequently, appellants, like the employees in *Ruggieri,* "are the kind [of

---

**18.** *"Field work related to planting, cultivating or harvesting operations* includes all farming operations on a farm or ranch which are normally required to plant, harvest or produce agricultural or horticultural commodities...." 29 C.F.R. § 500.20(r)(2)(ii) (emphasis in original).

agricultural laborers] Congress intended to protect." *Id.; see also Avalos v. La Conca d'Oro, Inc.,* 111 Lab.Cas. (CCH) ¶ 35,188, at 46,120 (E.D.Pa.1988) (finding mushroom work temporary or seasonal under AWPA despite fact that employees could qualify for paid vacation and holidays); *Marshall v. Buntings' Nurseries of Selbyville, Inc.,* 459 F.Supp. 92, 96 (D.Md.1978) (finding work "seasonal" under FLCRA in part because nature of business required hiring greater number of workers during certain portions of year, notwithstanding that some work was performed year-round).

To distinguish *Ruggieri,* Richardson points out that its employee turnover rate was not nearly as substantial as the employer's in that case.[19] But turnover rate is not dispositive of whether employment is seasonal under AWPA. To hold that it is would be to ignore Congress' intention that the protections of AWPA not be limited to workers with actual migratory tendencies. The judge in *Ruggieri* relied on several factors in concluding that the mushroom workers were migrant workers under AWPA, not the least of which were the differences in the tasks they performed from season to season. Those same seasonal differences characterize appellants' employment in the fern industry. Denying coverage under AWPA simply because workers can do *some* work for the employer at any given time during the year would leave unprotected many farm laborers in a state like Florida, where the weather is warm for most of the year. Keeping in mind the act's remedial objectives, therefore, we hold that appellants were engaged in "agricultural employment of a seasonal or other temporary nature."

### C.

To be migrant agricultural workers under AWPA, appellants also must have been "re-

quired to be absent overnight from their permanent place[s] of residence." 29 U.S.C. § 1802(8)(A). In our judgment, appellants satisfy this requirement even though they lived in Richardson's trailers year-round.

The regulations and legislative history define "permanent place of residence" generally as a "domicile or permanent home," 29 C.F.R. § 500.20(p)(2), "to which an individual intends to return," H.R.Rep. 97–885 at 8, 1982 U.S.C.C.A.N. at 4554. Significantly, however, "in no circumstances shall [permanent place of residence] be construed to include any person's home or residence when it is seasonal or temporary housing, such as a labor camp." H.R.Rep. 97–885 at 8, 1982 U.S.C.C.A.N. at 4554; *see* 29 C.F.R. § 500.20(p)(2); *Ruggieri Mushroom Farms,* Lab. L.Rep. (CCH) at 43,859. "[T]o ensure that agricultural workers' subjective intentions did not interfere with its own protective purposes, Congress specifically excluded 'seasonal or temporary housing such as a labor camp' from consideration." *Avalos,* 111 Lab. Cas. (CCH) at 46,121.

Appellants do not contend that their work required them to be away overnight from the Richardson trailers. Nor do they dispute that they lived in the trailers year-round during the six or so years they worked for Richardson. Rather, appellants assert that the trailer site was a labor camp. Because they lived in Richardson's labor camp, appellants reason, by definition they were required to be absent overnight from their permanent places of residence.

Neither the regulations nor the legislative history define the term "labor camp." To discern its meaning, therefore, we must consult related provisions of federal and state law. Moreover, we must determine what housing situations Congress intended the housing provisions of AWPA to cover.[20] This

---

**19.** The record indicates that Richardson's turnover rate was approximately 25 percent.

**20.** Section 1823 provides:

    **(a) Compliance with substantive Federal and State safety and health standards**

    Except as provided in subsection (c) of this section, each person who owns or controls a facility or real property which is used as housing for migrant agricultural workers shall be responsible for ensuring that the facility or real property complies with substantive Federal

and State safety and health standards applicable to that housing.

    **(b) Certification that applicable safety and health standards met; posting of certificate of occupancy; retention of certificate and availability for inspection and review; occupancy prior to inspection**

    (1) Except as provided in subsection (c) of this section and paragraph (2) of this subsection, no facility or real property may be occupied by any migrant agricultural worker unless either a State or local health authority or other

is so because the main reason Congress divided the workers covered by AWPA into migrant agricultural workers and seasonal agricultural workers was to confine the application of AWPA's housing provisions.[21] When we consider analogous statutes and identify the type of housing situations Congress meant to address, we discover that to be seasonal or temporary housing under AWPA, farmworker housing not only must possess certain physical characteristics, it must be tied to the terms or circumstances of the worker's employment in a particular and close way.

A labor camp typically "consists of barracks, cabins, trailers, tents, rooming houses, auto-court cabins, shack houses, and, on occasion, depreciated standard housing. Regardless of the type of facility, where the units are grouped for two or more families, they are commonly called 'camps.'" President's Comm'n on Migratory Labor, Migratory Labor in American Agriculture 138 (1951); *see, e.g.,* Fla.Stat. § 381.008(3) (1991); Ill.Rev. Stat. ch. 111.5, para. 185.2 (1992); Va.Code Ann. § 32.1–203 (Michie 1992). Rent may or may not be charged. *See, e.g.,* Fla.Stat. § 381.008(3). Neither a large number of tenant-workers nor a large number of housing units is required. *See, e.g.,* Ill.Rev.Stat. ch. 111.5, para. 185.2 (ten or more migrant workers); Iowa Code § 138.1(8) (1991) (seven or more migrants or two or more shelters); Va.Code Ann. § 32.1–203 (one or more migrant worker); *Marshall v. Souza Bros. Packing Co.,* 83 Lab.Cas. (CCH) ¶ 33,625 (C.D.Cal.1977) (describing labor camp that had capacity of twelve and usually housed six to eight persons). Employers benefit from seasonal housing like labor camps because it enables them to maintain their labor force and, in some cases, to hoard labor. *See* President's Comm'n at 142.

AWPA does not guarantee adequate housing, however, to all agricultural workers living in cabins or trailers. AWPA is a labor statute, not a housing statute. Whether a group of trailers whose occupants are farmworkers constitutes seasonal or temporary housing such as a labor camp for purposes of AWPA, therefore, depends on which housing situations Congress intended the act's housing provisions to cover.

The origin and scope of two Labor Department agencies' health standards for labor camps provide substantial guidance on this issue. *See Avalos,* 111 Lab.Cas. (CCH) at 46,121. In its AWPA regulations, the Labor Department expressly adopts as the health and safety standards for migrant housing under AWPA the standards of the Employment and Training Administration (ETA),[22]

appropriate agency has certified that the facility or property meets applicable safety and health standards. No person who owns or controls any such facility or property shall permit it to be occupied by any migrant agricultural worker unless a copy of the certification of occupancy is posted at the site. The receipt and posting of a certificate of occupancy does not relieve any person of the responsibilities under subsection (a) of this section. Each such person shall retain the original certification for three years and shall make it available for inspection and review in accordance with section 1862 of this title.

(2) Notwithstanding paragraph (1) of this subsection, if a request for the inspection of a facility or real property is made to the appropriate State or local agency at least forty-five days prior to the date on which it is occupied by migrant agricultural workers and such agency has not conducted an inspection by such date, the facility or property may be so occupied.

(c) **Applicability to providers of housing on commercial basis to general public**

This section does not apply to any person who, in the ordinary course of that person's business, regularly provides housing on a commercial basis to the general public and who provides housing to migrant agricultural workers of the same character and on the same or comparable terms and conditions as is provided to the general public.

29 U.S.C. § 1823.

21. Only migrant workers are entitled to the protections of the act's housing provisions. Congress defined migrant workers as those seasonal or temporary agricultural workers who are required to be absent overnight from their permanent places of residence; seasonal workers are those who are not. *Compare* 29 U.S.C. § 1802(8)(A) (migrant workers) *with id.* § 1802(10)(A) (seasonal workers). The requirement of overnight absence from the employee's permanent place of residence is thus the definitional device Congress used to identify the housing situations it intended AWPA's housing provisions to cover.

22. ETA "is the agency of the U.S. Department of Labor which administers the U.S. Employment Service pursuant to the Wagner–Peyser Act (29 U.S.C. 49 *et seq.*)." 29 C.F.R. § 500.130(e).

20 C.F.R. § 654.404 *et seq.*, and the Occupational Safety and Health Administration (OSHA),[23] 29 C.F.R. § 1910.142. *See* 29 C.F.R. § 500.132. In *Frank Diehl Farms v. Secretary of Labor,* 696 F.2d 1325 (11th Cir. 1983), this court defined the scope of OSHA's authority to regulate "temporary labor camps." The court held that worker housing is regulable only when a close relationship exists between the housing and the employment, namely, when housing is a condition of employment. *Id.* at 1329.[24] Similarly, a report by President Truman's Commission on Migratory Labor upon which ETA's labor camp standards were based, *see* 41 Op. Att'y Gen. 406, 408–09 & n. 1 (1959), emphasized the danger to the seasonal farmworker when, "to get a job in an area of active seasonal work, he must live in the employer's housing." President's Comm'n at 142. A close connection between housing and employment leaves the poor, uneducated worker vulnerable to the employer. Because the employer controls one necessity, he is able to treat the worker unfairly as to the other. *See id.* at 142–43.

■ The focus of these authorities on the relationship between housing and employment is consistent with the well established prime purpose of AWPA: protecting agricultural workers from exploitive conditions. *See Guerrero v. Garza,* 418 F.Supp. 182, 187 (D.Wis.1976) (holding that purpose of FLCRA is to prevent exploitation, not to provide jobs and housing); H.R.Rep. No. 97–885 at 2, 1982 U.S.C.C.A.N. at 4548. Keeping in mind once again the remedial purposes of AWPA, we thus conclude that Congress intended AWPA's housing provisions to ap-

ply when the conditions on which an agricultural employer provides housing are so closely related to the terms or circumstances of a seasonal or temporary worker's employment that the worker is vulnerable to exploitation by the employer. In such a situation, agricultural worker housing cannot be considered "permanent" in any meaningful sense, and hence is "seasonal or temporary" for purposes of the act.

The paradigm of risk of exploitation is when the employer requires the employee to live in employer provided housing. *Cf. Frank Diehl Farms,* 696 F.2d at 1333 (holding that OSHA may regulate housing when company policy forces workers to live in employer provided housing). In such a case, workers must accept the employer's housing or forgo a desperately needed job. Equally serious, however, is when the circumstances surrounding the worker's employment make it a practical necessity to accept employer provided housing.[25] When geographic isolation or lack of economically comparable alternatives, for example, drastically limits the farmworker's realistic housing options, the worker faces the same dilemma of submitting to the employer's housing conditions or passing up work necessary to feed herself and her family. *Cf. id.* at 1328 n. 5 & 1333 (quoting OSHA Instruction CPL 2.37). A third situation in which exploitation is possible is when employment is a condition of housing—when termination means eviction. Any action in that situation that displeases the employer—including complaining about work or housing conditions—could result in the worker being not only jobless but homeless as well. It is hard to imagine a situation in which a seasonal or temporary agricultural worker is more vulnerable.[26]

23. OSHA "is the agency of the U.S. Department of Labor which administers the Occupational Safety and Health Act (29 U.S.C. 651 *et seq.*) which provides for the establishment of safety and health standards generally." 29 C.F.R. § 500.130(d).

24. The court rejected the argument that it is insufficient under the Occupational Safety and Health Act that the housing is "directly related to the employment." *Frank Diehl Farms,* 696 F.2d at 1328–29. The court justified its narrow standard by noting that Congress' concern with this act was "avoidance of safety and health hazards at the place where work is performed." *Id.* at 1331. Only when housing is a condition of employment, the court reasoned, may housing fairly be considered a place of work. *Id.*

25. At least two courts have held that housing need not be provided by the employer to be subject to the housing provisions of AWPA. *See Simmons v. Middleton,* 107 Lab.Cas. (CCH) ¶ 35,-000, at 45,352 (M.D.Fla.1987); *Howard v. Malcolm,* 629 F.Supp. 952, 954 (E.D.N.C.1986). As this situation is not before us, we do not consider whether or how our analysis applies in the case of non-employer-provided housing.

26. Our holding that these situations involve risk of exploitation and thus trigger AWPA's housing provisions necessarily means that the scope of AWPA's housing provisions is broader than OSHA's power to regulate temporary labor camps under the Occupational Safety and Health Act. *See Frank Diehl Farms,* 696 F.2d at 1329

■ Applying these principles to the appellants in this case, we hold that, based on the evidence presented prior to the district court's involuntary dismissal of appellants' claims, the Richardson trailers constituted seasonal or temporary housing in the nature of a labor camp for purposes of AWPA. The trailer site, consisting of approximately eight substandard units for which some rent was charged, fits the description of a labor camp. At trial, Curtis Richardson, Richardson's president and owner, admitted that providing the housing to appellants enabled Richardson to establish long-term relationships with fern cutters. As a result, the company reaped the benefit of a more stable labor force. Most important, the record shows that the relationship between appellants' employment with Richardson and the terms and conditions of their housing left appellants at risk of exploitation by Richardson.[27] Appellants had few, if any, affordable housing alternatives. As a practical matter, to work in Richardson's fields, appellants had to live in its trailers. Moreover, employment was a condition of housing in the Richardson trailers. When Richardson fired appellants, it evicted them as well. Nor did appellants have the protection of a written lease. Viewing all of these factors together, appellants effectively were required to live in Richardson's seasonal or temporary housing, and entirely on Richardson's terms. Accordingly, they satisfy the second part of AWPA's definition of migrant agricultural worker.

■ The district court concluded, and Richardson argues on appeal, that appellants' residences were permanent, not seasonal or temporary, because appellants lived in the trailers year-round for several years. The language in the legislative history, however, that permanent place of residence shall not include "any person's home or residence when it is seasonal or temporary housing, such as a labor camp" strongly implies that "home" may be seasonal or temporary housing. Moreover, we must read the term "seasonal or temporary housing" in conjunction with similar terms from the same statutory section. *See, e.g., Barnson v. United States,* 816 F.2d 549, 554 (10th Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). In Part IV.B. above, we held that the parallel term "agricultural employment of a seasonal or temporary nature" is a functional term, not a durational one, which applies to appellants notwithstanding that they worked for Richardson throughout the year. Likewise, therefore, whether housing is seasonal or temporary turns on the nature of the relationship between the worker's employment and housing, not on the duration of the worker's stay. *See Avalos,* 111 Lab.Cas. (CCH) at 46,121. Of course, workers are most often vulnerable when they are truly migratory. Itinerant workers have no long-term interest in the places in which they are housed on the job, and consequently live almost totally at the mercy of the employer-landlord. Nevertheless, some farm laborers live in labor camps or other seasonal or temporary housing year-round, particularly in warm states like Florida where " 'on-job' and 'home-base' housing situations merge." President's Comm'n at 145. These workers, too, are subject to exploitation. In our view, Congress intended AWPA to cover these housing situations.

Richardson contends that if the trailers were not appellants' permanent places of residence, then appellants had to show some other permanent place of residence from which they were required to be absent. Taken to its logical conclusion, this argument would exclude from AWPA's housing provi-

---

(OSHA act covers only housing that is a condition of employment). This result is proper for two reasons. First, *Frank Diehl Farms* was based in large part on the fact that the OSHA statute is intended to regulate "the place where work is performed." *Id.* at 1331. Only when housing is a requisite for employment can it be considered part of the workplace. *See id.* at 1332. By contrast, AWPA is concerned with numerous aspects and incidents of employment in addition to actual work conditions, and looks beyond what may be considered the workplace *per se.* Second, the regulations imply strongly that AWPA's scope is broader than OSHA's insofar as the conditions of migrant labor camps are concerned. The regulations provide that "OSHA standards are enforceable under [AWPA], *irrespective of whether housing is, at any particular point in time, subject to inspection under the Occupational Safety and Health Act."* 29 C.F.R. § 500.132(a)(1) (emphasis added).

27. We do not hold that Richardson in fact exploited appellants in violation of AWPA. That is a question for the district court on remand.

sions otherwise homeless farm laborers who move from labor camp to labor camp, a result inconsistent with the act's well established remedial, humanitarian objectives. No meaningful distinction exists between farmworkers who migrate from labor camp to labor camp and farmworkers who remain in the same employer's seasonal or temporary housing, as seasonal or temporary housing is construed in this case. Both types of workers are vulnerable to exploitation by the employer as to the conditions of housing, and thus are entitled to the protections of AWPA. We hold, therefore, that appellants were "required to be absent overnight from [their] permanent place[s] of residence" as Congress intended this phrase to be applied in AWPA.

### D.

From the facts found by the district court based on the evidence appellants introduced at trial, we conclude that appellants were "employed in agricultural employment of a seasonal or other temporary nature" and were "required to be absent overnight from [their] permanent place[s] of residence." Thus, the district court erred in dismissing appellants' AWPA claims under Rule 41(b) on the ground that appellants were not migrant agricultural workers. Accordingly, the case must be remanded for Richardson to present its evidence relating to the AWPA issue, and for appellants to have the opportunity to add to the record and/or rebut Richardson's evidence, if any. *Riegel Fiber Corp.*, 512 F.2d at 793; *White*, 414 F.2d at 1340 & n. 7. At the close of all the evidence, the district court should enter findings of fact based on all of the evidence and should apply the legal principles set forth in this opinion to those facts.[28]

### V.

The next issue is whether the district court erred in dismissing appellants' claims under FLSA. We believe it did.

FLSA requires employers to pay agricultural workers a minimum wage. 29 U.S.C. § 206(a)(5). Those payments must be made "free and clear," with one exception. *Washington v. Miller*, 721 F.2d 797, 803 (11th Cir.1983) (per curiam) (adopting opinion of district court). Under section 3(m) of FLSA, "wage" "includes the reasonable cost ... to the employer of furnishing [the] employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees." 29 U.S.C. § 203(m).[29] Accordingly, the employer lawfully may deduct from an employee's pay the reasonable cost of employer provided housing, even if that deduction results in the employee's cash pay falling below the statutory minimum. Reasonable cost may not exceed the employer's actual cost. 29 C.F.R. § 531.3(a). The employer is responsible for maintaining and preserving records substantiating that cost. *Id.* § 516.27.

In *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468 (11th Cir.1982), we held that the plaintiff has the prima facie burden of showing "as a matter of just and reasonable inference that the wages paid to him did not satisfy the requirements of the FLSA." *Id.* at 475 n. 12; *see Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946), *superseded by statute on other grounds as stated in Carter v. Panama Canal Co.*, 463 F.2d

---

**28.** That this case must go back to the district court for new factfinding and application of law to fact gives occasion for us to reiterate the teachings of the former Fifth Circuit on the use of involuntary dismissals at the close of the plaintiff's evidence in a nonjury trial:

> From an administrative standpoint, this process of disposition under F.R.Civ.P. 41(b) is patently unsatisfactory. There has been a partial trial, followed by an appeal and reversal. There must now be a second trial, or at least another partial trial, and still more appellate consideration may be sought in the future. [In many cases, particularly uncomplicated ones,] it would [be] a simple matter indeed for the

District Court to carry the defendant's Rule 41(b) motion with the case, let the defendant put on his evidence, and enter final judgment at the close of the evidence. Not much time would [be] lost, and if one or both of the parties [seek] appellate review, the entire case [could] come before this Court at one time rather than in piecemeal fashion.

*White*, 414 F.2d at 1340 (footnotes omitted). The *White* court's warnings are as appropriate today as they were when they were issued more than two decades ago.

**29.** Facilities are not considered "customarily furnished" when they are furnished in violation of federal, state, or local law. 29 C.F.R. § 531.31.

1289, 1293 (D.C.Cir.1972). Once the employee proves that the wages received were less than the statutory minimum, the burden shifts to the employer to prove with proper records the reasonable cost of the housing it furnished. *Donovan,* 676 F.2d at 475. "An employer's unsubstantiated estimate of his cost, where the employer has failed to comply with the recordkeeping provisions of the FLSA, and where there has been no determination of reasonable cost by the Wage and Hour Division does not satisfy the employer's burden of proving reasonable cost." *Id.* (citing *Marshall v. DeBord,* 84 Lab.Cas. ¶ 33,-721, at 48,476 (E.D.Okla.1978)).

In this case, appellants alleged that the deductions Richardson made from their paychecks for rent and utilities unlawfully brought their net pay below minimum wage. The district court dismissed appellants' claims because it found that appellants had not proved that the deductions were unreasonable. In so doing, the court erroneously placed the burden of proof on appellants. Appellants introduced evidence showing that the deductions resulted in their net pay falling below minimum wage on many occasions. At times appellants' take-home pay was nothing. Under *Donovan,* the burden thus shifted to Richardson to prove with records that the deductions were reasonable.

Richardson's only evidence of reasonableness was the bare, conclusory testimony of Curtis Richardson. *Donovan* explicitly rejects as insufficient such unsubstantiated estimates of cost. Richardson argues here that it was unable to introduce records in the district court because appellants never got beyond their case in chief. But this is precisely the point. The district court erred in granting Richardson's Rule 41(b) motion for involuntary dismissal. On remand, Richardson will have the opportunity to introduce records showing that its deductions were reasonable.

## VI.

The judgment of the district court is REVERSED. The case is REMANDED back to the district court for further proceedings consistent with this opinion.